IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRIAN HILL,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      1:20-CV-00653
                                     )
TOWN OF MOCKSVILLE, NORTH            )
CAROLINA, PATRICK REAGAN, in         )
his official and individual          )
capacities, and MATT                 )
SETTLEMYER in his official and       )
individual capacities,               )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This lawsuit arises from Plaintiff former Mocksville Police Officer Brian Hill's alleged wrongful termination in retaliation for exercising his First Amendment right to free speech. (Doc. 1 at 8.) Before the court is a motion for summary judgment filed by Defendants Town of Mocksville; Patrick Reagan, its former police chief; and Matt Settlemyer, its Town Manager. (Doc. 10.) The court heard argument on the motion on September 23, 2021. For the reasons set forth below, Defendants' motion for summary judgment will be GRANTED.

## I.   BACKGROUND

The facts, either not in dispute or viewed in the light most favorable to Hill as the non-moving party, establish the following:

The Town of Mocksville ("Town") is located in Davie County, North Carolina, and operates under a council-manager form of government where the mayor and the five-member board of commissioners set Town policies. (Doc. 11-3 at 1.) Plaintiff Hill was employed by the Mocksville Police Department ("MPD") as a part-time officer in April 2015 before his promotion to a full-time position beginning in November 2015. (Doc. 16-3 at 21:6-22.) Roughly two years later, the Town received a grant to fund a K9 unit, and Hill was selected to become a K9 officer in January 2018. (Id. at 169:4-5.) Later that year, Hill was named Officer of the Year. (Doc. 16-1 at 2.)

During the time of Hill's employment, Defendant Matt Settlemyer was Town Manager, a position tasked with enforcing the Town's personnel policy and managing the Town on a day-to-day basis. (Id.) The Town Manager has final authority over all employment decisions. (Id.) At the same time, Defendant Patrick Reagan served as Mocksville Chief of Police, having been appointed in that role in April 2019. (Doc. 11-2 at 1.)

In 2019, Hill first began voicing his concerns to fellow officers when "things would come up that [he] knew wasn't right." (16-3 at 74:1-2.) These concerns included noting a shortage of officers on patrol, an excess number of people in the office, and events surrounding a stray cat at the police department. (Id. at 74:7-12.) As to the shortage of officers, Hill believed there

2

should be more officers on patrol, noting that on some nights Mocksville "would have maybe only two people working," whereas "there would be nine people in the office during the daytime."[1] (Id. at 79:9-12.) To Hill, "this allocation of manpower was wasteful." (Doc. 16-5 at 3.)

Hill's third concern regarding the innerworkings of the MPD relates to a stray cat that was brought to the police department. (Doc. 16-3 at 85:1-25.) The cat, who acquired the name "Sgt. Butters," was rescued by MPD staff; however, no one would tend to the cat over holidays and there were concerns that "the cat wasn't being taken care of." (Id.) Hill worried that some individuals were wrongfully calling the cat a "therapy cat" and claiming on social media the cat had "coaxed a confession out of a suspect," two claims Hill knew to be false. (Id.) Hill took umbrage at these falsehoods as instances of MPD misleading members of the public. (Id.)

Hill soon took his concerns to members of the Town Board, first reaching out to Board member Brent Ward in the summer of 2019. (Id. at 89:14-21.) Hill criticized MPD staff for the aforementioned acts and for engaging in what he believed to be illegal practices, including "giving cell phones to inmates at the

---

[1] In his deposition, Hill stated that he believed that there were approximately 2 to 3 patrol officers assigned at night, while there were the same number during the day. The difference was that during the day the MPD had more officers working in the office. (Doc. 16-3 at 79:7-17.)

3

jail, using individuals on parole to conduct drug busts, conducting illegal searches and seizures," and other various forms of fraud. (Doc. 16-4 at 3.) Hill told Ward that the MPD was "wasting taxpayer money by doing things such as having too many command staff and not enough officers, having too many officers in the office and too few on patrol, restriping patrol cars that did not need to be restriped, letting uninsured, untrained civilians do ride-alongs and even drive patrol cars, and promoting a cleaning person to investigations." (Id.)

In response to allegations by Hill and other officers, the Town Board engaged a consulting company, Developmental Associates, to audit and assess MPD practices. (Doc. 16-5 at 2; Doc. 16-2.) Prior to completion of the audit, however, Hill contacted Town Board member Eric Southern because Hill was "being targeted for harassment and retaliation for being critical of the police department." (Doc. 16-5 at 2.) Hill reiterated his concern that the allocation of manpower at MPD was wasteful. (Id. at 3.)

Developmental Associates released its findings in October 2019. (Doc. 16-2 at 2.) The report generally criticized the MPD for having a "lack of transparency," a group of employees who were "actively undermining the current police administration," and a "weakness in effective supervision at the patrol shift level especially during the evening and nighttime hours." (Id. at 6, 7, 10.) After the assessment, Hill informed Ward that MPD command

4

staff, including Reagan, and Settlemyer retaliated against Hill and other officers who had complained to the Town Board by harassing them, changing their schedules, and giving them bad performance reviews, although Hill does not specify which performance reviews were allegedly falsified.[2] (Doc. 16-4 at 3.)

One month later, command staff took away Hill's K9 partner because Hill was 15 minutes short of the required K9 training hours. (Doc. 16-3 at 92:9-14; 94:1-10.) But MPD informed local news media that the K9 was taken away because Hill was on vacation — which was untrue. (Doc. 16-6 at 2.) Hill later complained to Town Board member Amedia Vaughan-Jones that MPD command staff was lying to employees, the public, and the media about his K9. (Id. at 2.) Hill also reiterated his claim that MPD was lying about removal of the stray cat from MPD, a story which received media attention. (Id. at 3.; see Chelsea Frisbie, The Sgt. Butters saga; How a stray cat led to a small town scandal, WTAE Pittsburgh (Nov. [[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[[]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]]20, 2019).) Although Chief Reagan and Town Manager Settlemyer knew where the cat was, they "mislead [sic] the public about it and made it seem like" it was wrongfully taken from MPD. (Id.)

---

[2] The allegation that the performance reviews were given out of animosity toward Hill only extends to reviews given after Developmental Associates released its report in October 2019. Hill's disciplinary record reflects personnel issues with insubordination as early as December 2018.

In December 2019, Hill received an MPD personnel citation for failure in personal conduct, disobeying a supervisor's orders, and insubordination. (Doc. 16-3 at 57:20-25.) He was suspended for two-weeks without pay, an apparently unprecedented punishment for MPD.[3] (Doc. 16-6 at 3-4.) Chief Reagan based the suspension on Hill's actions during a multi-agency operation in which "Officer Hill utilized radio communication to clarify that he had blocked [his supervisor's] phone number." (Doc. 11-2 at 7.) Hill claims the basis for his suspension is "a complete lie," and appealed the suspension to Settlemyer. (Doc. 16-3 at 59:21.)

Settlemyer phoned Hill later that day to confirm receipt of Hill's suspension appeal. (Id. at 147:14-24.) During the call, Settlemyer asked Hill who he had told about his suspension, to which Hill replied that he had told his family, friends, and his attorney. (Id. at 148:1-2.) Settlemyer inquired further, stating that "if I find out that you've talked to any board members, this is not going to end well for you."[4] (Id. 148:9-16.) Despite this,

---

[3] As Defendants point out, Reagan was appointed chief in April 2019. (Doc. 11-2 at 1.) Any discipline, or lack thereof, prior to that time would have been administered not by Defendant Reagan, but by a predecessor. MPD's prior leadership was the subject of substantial criticism. See Hunter v. Town of Mocksville, N.C., 789 F.3d 389, 393-94 (4th Cir. 2015). In May 2021, the Town voted to dissolve the MPD, and law enforcement is now contracted with the Davie County Sheriff's Office.

[4] This statement is properly viewed as a personnel matter and not a matter of public concern. That is, even if it were a threat, a town manager's instruction to an employee not to disclose personnel matters is a reasonable one.

Hill continued to meet with Board member Vaughan-Jones and Ward, who was no longer a Board member, as well as other citizens to discuss general issues with MPD and Hill's specific problems. (Doc. 16-3 at 117:1-119:25.) The record does not reflect that Settlemyer took any favorable action on the appeal.

After his two-week suspension and a scheduled annual leave, Hill resumed work as a patrol officer. (Id. at 8.) Hill began surreptitiously recording conversations he had with MPD command staff.[5] (Id. at 5.) Chief Reagan became aware of these recordings on February 10, 2020, at which point he met with Hill. (Doc. 11-2 at 1.) Hill admitted to making the recordings. (Id.) As a result of this meeting, Chief Reagan recommended to Settlemyer that same day that Hill be terminated for violating MPD policies 318.5.6 (prohibiting unauthorized access and disclosure of confidential or protected information), 421.5.2 (prohibiting surreptitious recording other MPD personnel), and 421.6 (prohibiting use of personal recording devices to retain recordings of information obtained while on duty). (Id. at 1, 121, 151-52.)

Settlemyer then met with Hill to discuss his violations of MPD policy and Chief Reagan's recommendation. (Doc. 16-3 at 30:2-25.) At the end of that meeting, Settlemyer accepted Chief

---

[5] It is unclear how many recordings were made and when Hill first began recording conversations with other MPD employees.

Reagan's recommendation and terminated Hill's employment on February 13, 2020. (Doc. 11-3 at 106.) This action followed.

## II. ANALYSIS

A court must grant a motion for summary judgment if the pleadings, depositions, and affidavits submitted show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Under this standard, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. As a result, the court will only enter summary judgment in favor of the moving party when the record "shows a right to judgment with such clarity as to leave no room for controversy" and clearly demonstrates that the non-moving party "cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994) (internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions . . ." Anderson, 477 U.S. at 255. On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

8

While the movant bears the initial burden of demonstrating that there are no genuine disputes of material fact, once that burden has been met, the non-moving party must demonstrate that a genuine dispute of material fact actually exists. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to circumvent summary judgment. Anderson, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Id. at 248–49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

Hill contends he was terminated in retaliation for exercising his First Amendment right to free speech when he began speaking out about "mismanagement and corruption" at MPD. (Doc. 1 at ¶ 15.) The Fourth Circuit has adopted a three-part test to determine whether a public employee has stated a claim for retaliation in violation of his First Amendment rights. See McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998). First, a public employee must show that he spoke as a citizen, not an employee, on a matter of public concern. Id. at 277; Smith v. Frye, 488 F.3d 263, 267 (4th Cir. 2007). Second, the court must balance the employee's interest in

9

speaking out with the government's interest in providing effective service to the public. See Hunter v. Town of Mocksville, N.C., 789 F.3d 389, 397 (4th Cir. 2015). Third, if the balance weighs in favor of the employee, he must then show that his speech was a "substantial factor in [his] termination decision." McVey, 157 F.3d at 278. If an employee meets this burden, then the burden shifts to the employer to show that "the employee would still have been discharged in the absence of the protected speech." Hughes v. Bedsole, 48 F.3d 1376, 1385-86 (4th Cir. 1995) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The first prong, whether the speech addressed a matter of public concern, is "[t]he threshold question." Rankin v. McPherson, 483 U.S. 378, 384 (1987). If an employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary . . . to scrutinize the reasons for [the employee's] discharge." Connick v. Myers, 461 U.S. 138, 146 (1983).

   A.  **Matter of Public Concern.**

      1.  **Speech as Citizen or Employee**

In determining the extent of First Amendment protections extended to a government employee's speech, the court must first determine whether the employee was speaking as a citizen or whether the speech was within the scope of the employee's duties. See

*Pickering v. Board of Ed. of Twp. High Sch. Dist. 205. Will Cty.*
*Ill.*, 391 U.S. 563, 573 (1968).  The "mere fact that a citizen's
speech concerns information acquired by virtue of his public
employment does not transform that speech into employee—rather
than citizen—speech."  *Lane v. Franks*, 573 U.S. 228, 240 (2014).
The critical question is "whether the speech at issue is itself
ordinarily within the scope of an employee's duties, not whether
it merely concerns those duties."  *Id.*  The court may consider
additional factors such as whether the employee spoke on his free
time, whether he was at work, and whether he used private means of
communicating the speech.  *See* *Hunter v. Town of Mocksville, N.C.*,
789 F.3d 389, 399 (4th Cir. 2015).

Defendants first argue that Hill spoke "as a Mocksville police
officer" because his speech occurred in the "context of internal
complaints about conditions of his employment to his supervisors
or Town Board members."  (Doc. 11 at 8-9.)  Hill responds that
speaking to the Town Board was not part of his official job duties
and it was not within the "ordinary scope of [his] duties to speak
. . . about corruption, waste, employment decisions, or violations
of citizens' rights."  (Doc. 16 at 12.)

As an MPD officer, Hill's "fundamental duty" was to "serve
the community; to safeguard lives and property; to protect the
innocent against deception, the weak against oppression or
intimidation and the peaceful against abuse or disorder; and to

11

respect the constitutional rights of all to liberty, equality and justice." (Doc. 11-2 at 10.) Nothing before the court suggests that his "'daily professional activities' included calling the [elected official's office] for any purpose, much less to express concerns about the Mocksville PD." Hunter, 789 F.3d at 399 (quoting Garcetti v. Ceballos, 547 U.S. 410, 422 (2006)). Town Board members are not in Hill's chain of command — general employment concerns, as Defendants argue these complaints are, would first go to Hill's supervising officer, then to Chief Reagan, and finally to Town Manager Settlemyer. On matters of "internal complaints about conditions of his employment," Hill would speak to those in his chain of command. However, to the extent Hill's communication with Town Board members, who were removed from the hiring and firing of MPD personnel, involved topics such as illegal cellphone use and conducting illegal searches, they were not personal grievances. Rather, it is akin to a public employee contacting the media when doing so was outside the employee's job duties. See Lane v. Anderson, 660 F. App'x 185, 191 (4th Cir. 2016) (holding that a deputy sheriff was speaking as a private citizen because he was acting outside the scope of his employment in communicating with the media.)[6] Much like a sheriff's deputy

_____

[6] While the Fourth Circuit does not ordinarily accord precedential value to its unpublished opinions, it has noted that they "are entitled only to the weight they generate by the persuasiveness of their reasoning." See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

that contacts the media outside his employment, as a patrol officer and as a city employee, there is no indication in the record that Hill would have been required by his job to interact with Town Board members.

Additionally, Hill spoke to the Town Board members on his own time, using his own private cellphone, and met with other private citizens to discuss MPD practices outside his work hours. (Doc 11-4 at 27.) This serves as additional evidence that Hill was speaking as a private citizen. See Hunter, 789 F.3d at 399 (finding that three police officers were acting as private citizens when they met in their free time away from work and used their private phones for their communication). Hill's job description, the fact that his employment status did not require him to communicate with Town Board members, and the fact he did so on his own time with his own devices, leads to the conclusion that Hill spoke as a private citizen.

### 2. Matter of Public Concern

Having so concluded, the court must determine whether Hill's speech was on a matter of public concern. While there are no "sharp lines" drawn for when an employee's speech concerns a public matter, courts should "consider the content, form, and context of a given statement." Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012) (internal citations omitted). Generally, speech "involves a matter of public concern when it involves an issue of social,

political, or other interest to a community." Kirby v. City of Elizabeth City, N.C., 388 F.3d 440, 446 (4th Cir. 2004). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992). The "inquiry into the protected status of speech is one of law, not fact." Connick, 461 U.S. at 148 n. 7.

Defendants argue that Hill's speech did not involve matters of public concern, because all his complaints "relate to the conditions of his employment or a silly issue like Butters the cat." (Doc. 11 at 10.) Hill responds that his complaints centered on MPD engaging in illegal practices, lying to the public, and wasting taxpayer money, which are matters of public concern. (Doc. 16 at 12.)

While several of Hill's complaints do not constitute matters of public concern,[7] some center on issues that rise to that level.

---

[7] Hill's complaints about his superiors (such as complaints of being given a "hard time" when he called in sick and being assigned multiple warrant services (Doc. 11-4 at 27-30) are better understood as personnel grievances which do not rise to the level of public concern. Hill's complaints about the travails of the stray cat, which he characterizes as MPD deception rather than a "silly" matter, fall into the same category. Though the cat escapade culminated in someone placing a "dead 10-foot black snake" on Town Board member Vaughan-Jones's mailbox with

14

For instance, during his discussions with Town Board members, Hill alleged that MPD staff were engaging in illegal police practices, such as giving a cell phone and money to inmates at the jail. (Doc. 16-3 at 112:6-11.)  If true, these complaints raise possible violations of North Carolina law.  <u>See</u> N.C. Gen. Stat. § 14-258.1(d) (prohibiting any person from giving inmates a "mobile telephone or other wireless communication device").  Whether those tasked with enforcing laws are themselves abiding by them is a matter of public concern.  Such allegations challenge not only the capability of the police department to properly uphold the law throughout the community but allege potential corruption between members of the MPD and various inmates.  Allegations of corrupt and illegal practices "obviously involve[] a matter of significant public concern." <u>Lane v. Franks</u>, 573 U.S. 228, 241 (2014).

Accordingly, the court finds that Hill satisfies the first prong of the <u>McVey</u> test, as he spoke as a private citizen on a matter of public concern.

---

a note attached saying "bring the cat back" (Doc. 16-6, ¶ 9), the record fails to connect this to any conduct of the Defendants.  Hill relies on Board Member Vaughan-Jones' statement that "[t]he Chief [of Police] and the Town Manager removed the cat and knew where it was the entire time but mislead [sic] the public about it and <u>made it seem</u> like I had taken it."  (<u>Id.</u>) (emphasis added).  However, based on contemporaneous news reports cited by Hill, it was Mocksville's mayor, not the Defendants, who attributed the cat's disappearance to Vaughan-Jones.  <u>See</u> Chelsea Frisbie, <u>The Sgt. Butters saga; How a stray cat led to a small town scandal</u>, WTAE Pittsburgh (Nov. 20, 2019) ("I called the mayor and said 'Is it true that a Town Board member walked into the police department and demanded the cat be removed?' and the mayor told me yes.").

**B.  Hill's Interest in Speaking Out Weighed Against MPD's Interest in Providing Effective Service.**

Having found that Hill satisfies the threshold question of the McVey test, the court must now weigh Hill's interest in speaking against the government's interest in promoting the "efficiency of the public services it performs through its employees." Campbell v. Galloway, 483 F.3d 258, 266 (4th Cir. 2007) (citing Connick v. Myers, 461 U.S. 138, 142 (1983)).  The government is granted leeway to maintain the discipline and harmony needed to complete the mission of its agency.  McVey, 157 F.3d at 277.  Given their paramilitary status, police department officials are afforded "greater latitude . . . in dealing with dissension in their ranks." Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992).  In addition to the employee's personal interest in speaking, "the public's interest in hearing the employee's speech also weighs in the balance: 'A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it.'" Brickey v. Hall, 828 F.3d 298, 304 (4th Cir. 2016) (quoting McVey, 157 F.3d at 279 (Murnaghan, J., concurring)).

The government need not "prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" Maciariello, 973 F.2d at 300 (citing Jurgensen v. Fairfax Cty., Va., 745 F.2d 868, 879 (4th

16

Cir. 1984). However, "the amount of disruption has to outweigh the importance of the speech and its concern to the public." Durham v. Jones, 737 F.3d 291, 302 (4th Cir. 2013). Speaking on matters of substantial concern "must be met with a similarly substantial disruption in the calibration of the controlling balancing test." Id. "Whether the employee's interest in speaking outweighs the government's interest is a question of law for the court." Smith v. Gilchrist, 749 F.3d 302, 309 (4th Cir. 2014) (citing Joyner v. Lancaster, 815 F.2d 20, 23 (4th Cir. 1987)).

Hill argues his statements "could only have had a positive impact on the MPD's ability to provide for the safety of the Town," because citizens are better served by a police force that is not irresponsible or deceitful and therefore his interest outweighs the Town's. (Doc. 16 at 16.) Defendants argue that the Town's interests in delivering efficient police services and in prohibiting surreptitious recordings between employees "far outweighs Plaintiff's allegations" because the policy strives to "maintain a harmonious workplace." (Doc. 11 at 13.) Defendants thus attempt to balance the Town's interest with Hill's interest in recording his colleagues; however, Hill does not contest the recording policy. The proper balancing is between Hill's interest in speaking to Town Board members and the Town's interest in providing efficient public service.

Viewing the facts in the light most favorable to Hill, and

17

because the Defendants offer no explanation as to the balancing between Hill's speech on allegedly illegal matters and MPD efficiency, Hill's interest in speaking outweighs the MPD's interest in promoting efficient public service.  There is a strong public interest in allegations of illegal conduct undertaken by supervisors within a police department.  As the Fourth Circuit has noted, "[s]erious, to say nothing of corrupt, law enforcement misconduct is a substantial concern that must be met with a similarly substantial disruption in the calibration of the controlling balancing test." Durham, 737 F.3d at 302.  Defendants provide no argument as to how Hill's conversations with Town Board members disrupted or threatened to disrupt the MPD's ability to deliver efficient police services.  Absent an actual or foreseeable threat of disruption, the substantial public concern and Hill's interest in speaking out outweigh the Town's interest.

   **C.   Hill's Speech As "But For" Cause of His Termination.**

   The third prong of the McVey test "presents an issue of fact" as to whether Hill's "speech was 'a substantial factor' in his termination." Lane v. Anderson, 660 F. App'x. 185, 193 (4th Cir 2016) (quoting McVey, 157 F.3d at 277-78).  Plaintiff must first "show that his protected expression was a substantial or motivating factor in the employer's decision to terminate him." Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993) (internal quotations omitted).  Defendants may still avoid liability if they can show,

18

"by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination." Id. (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 416-17 (1979)).

Defendants argue that Hill cannot show a "'but for' connection between" his speech and termination because he would have been fired for violating MPD policies "even in the absence of the allegedly protected conduct." (Doc. 11 at 11.) Hill argues that Defendants "incorrectly attempt[] to force a 'but-for' analysis" onto what should be the "less stringent" motivating factor standard, under which Hill's speech served as a motivating factor in his termination. (Doc. 16 at 18-19.)

Hill has incorrectly characterized the final prong of the McVey test. He is correct to note that in order to state a prima facie claim for retaliatory discharge under the First Amendment, he must show that his speech was a 'substantial' or 'motivating' factor in Defendants' decision to terminate him." (Doc. 16 at 18.) See McVey, 157 F.3d at 277-278 (holding that in evaluating whether a public employee "has stated a claim under the First Amendment for retaliatory discharge," a plaintiff must show that his "speech was a substantial factor in the employee's

19

termination.") (emphasis added).  Hill is also correct that the Supreme Court has provided guidance as to what a plaintiff must show to satisfy the "motivating factor" standard.  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013) (holding that a plaintiff could meet his burden by showing "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives") (emphasis added).

However, Hill's argument that there is no "but for" inquiry relies on a misinterpretation of the relevant cases, principally McVey and Hunter v. Town of Mocksville, N.C., 789 F.3d 389 (4th Cir. 2015).  In McVey, the Fourth Circuit held that "to determine whether a public employee has stated a claim under the First Amendment for retaliatory discharge, we must determine . . . (3) whether the employee's speech was a substantial factor in the employee's termination decision."  157 F.3d at 277.  McVey, however, was decided in the context of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Id. at 274.  The question therefore was whether the plaintiff had pleaded "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Thus, the "motivating factor" standard related to the plausibility of the complaint, which does not even require a showing of a prima facie case.  See Bing v.

20

<u>Brivo Sys's, LLC</u>, 959 F.3d 605, 616 (4th Cir. 2020) (holding "'an employment discrimination plaintiff need not plead a prima facie case of discrimination' to survive a motion to dismiss") (quoting <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 515 (2002)). Here, in contrast, the question on summary judgment is whether Defendants are entitled to judgment as a matter of law in the absence of disputed material facts. <u>See</u> Fed. R. Civ. P. 56(a). Hill is therefore correct that his burden for a prima facie case is to show that his allegedly protected conduct was a "motivating" or "substantial" factor in his termination. But the inquiry does not end there. A defendant may avoid liability upon showing by a preponderance of the evidence "that it would have reached the same decision as to [the plaintiff's employment] even in the absence of the protected conduct." <u>Mt. Healthy</u>, 429 U.S. at 287.

In <u>Hunter</u>, the plaintiff police officers alleged they were unconstitutionally fired in retaliation for their protected speech. 789 F.3d at 393. The case was before the Fourth Circuit on the question of qualified immunity. Though the "motivating factor" analysis was never reached because it was not properly before the court, Hill nevertheless points to the court's citation to <u>Wagner v. Wheeler</u>, 13 F.3d 86, 90 (4th Cir. 1993), for the statement "that a plaintiff claiming retaliatory discharge in violation of his First Amendment rights 'must show that his protected expression was a 'substantial' or 'motivating' factor in

the employer's decision to terminate him.'" Hunter, 789 F.3d at 400 (citing Wagner, 13 F.3d at 90). Wagner makes clear, however, that the "motivating factor" analysis is only the plaintiff's initial burden to establish a prima facie case:

> The initial burden lies with the plaintiff, who must show that his protected expression was a "substantial" or "motivating" factor in the employer's decision to terminate him. If the plaintiff successfully makes that showing, the defendant still may avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination.

13 F.3d at 90 (internal citations omitted).

Contrary to Hill's contention, therefore, once a plaintiff shows that his speech was a substantial factor in his termination, the burden shifts to the defendant to show that "the employee would still have been discharged in the absence of the protected speech." Hughes v. Bedsole, 48 F.3d 1376, 1385-86 (4th Cir. 1995) (citing Mt. Healthy, 429 U.S. at 287 (1977)); see Givhan, 439 U.S. 410 (1979); Huang v. UNC Board of Governors, 902 F.2d 1134, 1140 (4th Cir. 1990) (holding that the "claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action.").[8]  Other circuits follow the Fourth

---

[8] In Huang, the Fourth Circuit held that plaintiffs asserting First Amendment whistle-blower claims "must show a causal relation between the expression of public concern and the retaliatory action. The causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant

Circuit's burden-shifting analysis. See Benison v. Ross, 765 F.3d 649, 658 (6th Cir. 2014) (once a plaintiff shows speech was a "motivating factor," the burden "shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct," in which case summary judgment is warranted); Gillette v. Delmore, 886 F.2d 1194, 1198 (9th Cir. 1989) (after finding a prima facie case, the defendant "thus has the burden of showing that [plaintiff] would have been terminated" for other incidents absent the protected conduct); Bryson v. City of Waycross, 888 F.2d 1562, 1566 (11th Cir. 1989) ("if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment decision, the state must prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" (citing Mt. Healthy, 429 U.S. at 286).

---

must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." 902 F.2d at 1140. This phrasing seems to be in tension with that of Givhan. In Givhan, the Supreme Court stated, "it is not surprising that respondents did not attempt to prove in the District Court that the decision not to rehire petitioner would have been made even absent consideration of her 'demands.'" 439 U.S. 410, 417 (1979). The respondent in Givhan was a school district which was sued for terminating a teacher allegedly as a result of the teacher's free speech. Id. at 410. Therefore, the burden in Givhan to show "but for" causation was placed on the defendant school district, not the claimant teacher. As here, the Mt. Healthy line of cases permits a defendant to avoid liability where the defendant has shown by a preponderance that the decision to terminate the plaintiff's employment "would have been made even absent consideration of [the plaintiff's allegedly protected activity]." Givhan, 439 U.S. at 417 (1979).

23

Here, the court can assume, without deciding, that Hill's speech was a "motivating factor" in his termination, because Defendants have shown by a preponderance of evidence – which Hill does not dispute - that Hill's speech was not the "but for" cause of his termination. In this regard, Huang is instructive. There, Huang, a tenured professor in biological and agricultural engineering ("BAE") at North Carolina State University, voiced concerns about an improper business arrangement between the head of his department and another BAE faculty member. 902 F.2d at 1139. Six years later, Huang was involuntarily transferred to another department within the university. Id. at 1136. He filed suit pursuant to § 1983, alleging he was involuntarily transferred in violation of his First Amendment rights because he spoke out on improper arrangements within his former department. Id. The district court granted summary judgment for the defendants, finding that Huang's involuntary transfer did not deprive him of a constitutionally-protected property interest. Id. at 1140.

The Fourth Circuit found that the district court was mistaken as to the reason but nevertheless affirmed the grant of summary judgment because the evidence failed to show that Huang's expression was the "but for" cause of his transfer. Id. at 1140. The Fourth Circuit assumed that Huang's statements were on matters of public concern but determined that "summary judgment was plainly appropriate" because "[a] jury could not reasonably have found the

24

requisite 'but for' causation." Id. at 1141. The record before the district court contained a university report that detailed "numerous conflicts and problems concerning Dr. Huang's professional performance," a "unanimous BAE senior faculty recommendation calling for Dr. Huang's discharge on professional performance grounds," and a report that "a transfer would be in the best interests of Dr. Huang and the university." Id. The Fourth Circuit concluded that based on this record, there was "not a scintilla of evidence that the Chancellor's decision was infected with a retaliatory motive." Id.

Like the Chancellor in Huang, Settlemyer was presented with a report that indicated numerous conflicts and problems concerning Hill's conduct as a police officer, Chief Reagan's recommendation that Hill be terminated, and Hill's admittance to violating three MPD policies. In his memo to Settlemyer recommending Hill's termination, Chief Reagan noted numerous instances in which Hill was disciplined for insubordination towards his supervisors or poor job performance. Beginning in January 2019, Hill was reprimanded for "explicit and derogatory conduct while on duty" for viewing and sharing personal information from a coworker's cellphone without permission. (Doc. 11-2 at 6). Three months later in April, Hill was reprimanded "for insubordination following a heated discussion [with his supervisor] in the MPD parking lot." (Id.) In December 2019, Hill was again cited for

"obvious and clear insubordination" when he blocked his supervisor's cellphone number during a multi-agency operation. (Id.) While Hill claims in conclusory fashion that "most everything in [the disciplinary citation] was a complete lie," (Doc. 16-3 at 59:21, 162:5-10), he does not contest any of the reported disciplinary actions with specific facts and, more importantly, nothing in the record suggests that Chief Reagan's report was pretextual. Less than three months prior to Hill's termination, Chief Reagan wrote that "[p]revious attempts to correct [Hill's] behavior, negative attitude, and poor job performance have been challenged at various levels (including direct contact with elected officials). It appears MPD has nothing more to offer this individual and concerns about department liability are now paramount." (Id.) Though Hill's job performance was apparently satisfactory for a time, the record reflects that his employment was marked by increasingly severe incidents of insubordination and conflict with his supervisors.

Despite these multiple prior instances, Chief Reagan did not recommend Hill's termination until he became aware of Hill's violation of the MPD recording policy and Hill's admission to recording coworkers.[9] Chief Reagan noted that "prior to learning

---

[9] Hill makes an ancillary argument that other MPD staff members "frequently violated other policies, but very few were disciplined, and none [sic] were terminated." (Doc. 16 at 9.) This claim relies on Vaughan-Jones's affidavit, which states that "another officer had

of these policy violations by Hill, I had received several other issues and complaints about Hill[] . . . I recommended that Hill be terminated based upon his violations of Mocksville Police Department policies for recordings." (Doc. 11-2 at 1.) Chief Reagan's recommendation came immediately after Hill admitted to violating three department policies. (Id. at 3.) By the time of his termination, over 11 employees had filed complaints against Hill – the validity of which he has not contested - or asked that they not be assigned as his supervisor or serve on a squad with him because Hill had uttered "inappropriate comments and offensive language" and engaged in conduct that "constitutes a hostile work environment."[10] (Id. at 7-8.) Chief Reagan made numerous attempts

_____

violated policy by losing two firearms and she was not fired" and "staff violated the Police Department's social media policy frequently both before and since Brian's termination, but very few people were disciplined and none [sic] were terminated." (Doc. 16-6, ¶ 17.) Apart from being vague and ambiguous, this claim lacks any factual support in the record. There is no indication as to who these individuals are, any prior discipline they had received, or even that they are similarly situated to Hill. To be sure, there is no contention that any other MPD officer previously surreptitiously recorded other MPD officers at work in violation of the MPD's written policy.

[10] In December 2018, Captain Reynolds submitted a request "asking to cease supervision of Officer Hill due to incapability issues." (Doc. 11-2 at 5.) In January 2019, Hill was reprimanded for "engag[ing] in explicit and derogatory conduct while on duty which made some in the community uncomfortable with him." (Id. at 6.) In April 2019, Hill was reprimanded for insubordination after "a heated discussion [with his supervisor] in the MPD parking lot." (Id.) In June 2019, Captain Finney "asked repeatedly to refrain from supervising Officer Hill." (Id.) In September 2019, Hill was moved to day-shift under the supervision of Detective Sergeant Leonard and "immediately challenged Det. Sgt. Leonard with scheduling and K9 responsibilities." (Id. at 7.) In November 2019, Hill was reprimanded for failing to meet his minimum required training

to place Hill in "an environment where he can be productive," but all attempts apparently failed, and Hill continued to be "insulting and arrogant, while demeaning those who he feels are not on his level." (Id.)

The only evidence in the record is that it was this recommendation by Chief Reagan on which Settlemyer relied in deciding to terminate Hill, and there is no indication that accepting this recommendation was an unusual course of action. Put differently, there is no evidence that with his surreptitious recording of his coworkers and with his multitude of personnel complaints, Hill would not have been terminated had he not engaged in his allegedly protected speech with Town Board members.

As in Huang, a jury could not reasonably find "the requisite 'but for' causation" where Settlemyer reached his termination decision after meeting with Hill and reviewing Hill's multiple personnel complaints, receiving Chief Reagan's termination recommendation, and hearing Hill's admission that he violated

---

hours with his K9 in September and October. (Id.) Since his employment, several officers had recorded complaints against Hill: "Sr. Officer Rhodes, Former Sr. Officer Armstrong, and Sgt. Nichols requested not to supervise Officer Hill. Officer S. Greene and C. Greene asked to be moved from any squad [to which] Officer Hill is assigned. Det. Jones has asked to have only necessary involvement with Officer Hill as it pertains to immediate investigation. Lt. Hefner has asked not to supervise Officer Hill. Captains Robbins and Reynolds have also asked to remove Officer Hill from their supervision." (Id. at 7-8.) Two non-uniformed staff members also made complaints against Hill for "inappropriate comments and offensive language." (Id.) Hill does not contest the validity of any of these complaints.

28

three MPD policies when he recorded his coworkers. <u>Huang</u>, 902 F.2d at 1141. Consequently, Defendants have met their burden of demonstrating by a preponderance that Hill's violation of MPD policies on secret recordings of MPD employees – which on this record is an undisputed fact, and not his First Amendment activity, was the "but for" cause of his termination. See <u>Wagner</u>, 13 F.3d at 91-92 (finding alternatively that "even were we of the opinion that Wagner had made the threshold showing of causation, we would be compelled to hold Wheeler entitled to summary judgment on the grounds that he has proved that Wagner's first amendment activity was not the but for cause of the termination"). In summary, to permit Hill's claim to proceed on this record would thwart the Town's ability to make a justified performance-related decision to terminate an employee merely because the employee engaged in some First Amendment-protected activity unrelated to the ultimate decision. <u>Mt. Healthy</u>, 429 U.S. at 286 (stating that a public employee "ought not to be able, by engaging in such [first amendment-protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record").

Having reached this result, the court need not consider Defendants' alternative arguments, including that Defendants are protected from suit by qualified immunity.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the Defendants' motion for summary judgment is GRANTED and this action is DISMISSED WITH PREJUDICE.

/s/   Thomas D. Schroeder
United States District Judge

December 17, 2021